In the Matter of The CITY OF OWATONNA'S NPDES/SDS PROPOSED PERMIT REISSUANCE FOR the DISCHARGE OF TREATED WASTEWATER (A03–331),

In the Matter of The CITY OF FARIBAULT'S NPDES/SDS PROPOSED PERMIT REISSUANCE FOR the DISCHARGE OF TREATED WASTEWATER (A03–333).

Nos. A03–331, A03–333.

Court of Appeals of Minnesota.

Jan. 6, 2004.

Janette K. Brimmer, Minnesota Center for Environmental Advocacy, St. Paul, MN, for relator Minnesota Center for Environmental Advocacy.

Christopher M. Hood, Steven W. Nyhus, Thomas P. Klecker, Flaherty & Hood, P.A., St. Paul, MN, for respondents Cities of Owatonna and Faribault.

Mike Hatch, Attorney General, Robert B. Roche, Stephanie Morgan, Assistant Attorneys General, St. Paul, MN, for respondent Minnesota Pollution Control Agency.

Considered and decided by
KALITOWSKI, Presiding Judge,
HALBROOKS, Judge, and
STONEBURNER, Judge.

## OPINION

KALITOWSKI, Judge.

Relator Minnesota Center for Environmental Advocacy (MCEA) challenges the decision of respondent Minnesota Pollution Control Agency (MPCA) to reissue National Pollutant Discharge Elimination System (NPDES) permits to wastewater treatment facilities in respondents Faribault and Owatonna without requiring removal of phosphorus from the facilities' discharge to a limit of 1 mg/L.

## FACTS

This consolidated appeal arises out of the MPCA's issuance of NPDES permits for the Faribault and Owatonna wastewater treatment facilities without phosphorus effluent limits. Relator contends that because (1) phosphorus discharges from the two facilities affects Lake Byllesby; and (2) the facilities are not removing phosphorus "to the fullest practicable extent," the MPCA was required to impose a phosphorus limit pursuant to Minn. R. 7050.0211, subp. 1a (2001) (the phosphorus rule). In the alternative, relator contends that the evidence demonstrates a dispute of material fact such that contested case hearings on issuance of the facilities' permits are warranted.

The phosphorus rule states in relevant part: "Where the discharge of effluent is directly to or affects a lake or reservoir, phosphorus removal to one milligram per liter shall be required...." Minn. R. 7050.0211, subp. 1a. The rule goes on to state: "In addition, removal of nutrients from all wastes shall be provided to the fullest practicable extent wherever sources of nutrients are considered to be actually or potentially detrimental to preservation or enhancement of the designated water uses." *Id.*

In March 2000 the MPCA developed a phosphorus guidance document entitled the Phosphorus Strategy. The Phosphorus Strategy states that "affects" in the

phosphorus rule is "measured in terms of actual or predicted increases in chlorophyll-a concentration, increased frequency of nuisance algae blooms, reduced transparency, reduced dissolved oxygen concentrations (attributable to decaying algae), or related adverse responses to phosphorus." The Phosphorus Strategy further defines "measurable impact" as "the individual contribution of the discharge in causing any of the adverse changes [discussed in the definition of 'affects']."

Phosphorus is an important measure of water quality of a lake or reservoir because excessive phosphorus results in adverse changes in water quality. These changes have a negative impact on fish, vegetation, and oxygen levels. Responses to phosphorus in the system can be determined by measuring chlorophyll-a and water transparency. In 1996, the MPCA reported that Lake Byllesby's phosphorus levels far exceeded the natural levels for its applicable ecoregions. At that time, Lake Byllesby's average summer in-lake phosphorus levels were 258 micrograms per liter (μg/L). According to the MPCA, the target phosphorus levels for Lake Byllesby's ecoregions are 40–90 μg/L. The MPCA also noted that Lake Byllesby is suffering a variety of adverse effects from the high phosphorus levels. And Lake Byllesby has recently been included on the state's Impaired Waters List as being impaired by excess nutrients.

Both Faribault and Owatonna operate wastewater treatment facilities that discharge to the Straight River, which flows into the Cannon River, and finally to Lake Byllesby. The Faribault wastewater facility is located approximately 26–27 miles upstream from Lake Byllesby; the Owatonna facility is located approximately 45–46 miles upstream from Lake Byllesby. Both cities are required to hold a NPDES permit, which is reviewed and reissued by the MPCA approximately every five years. Currently, Owatonna discharges phosphorus at 2.6 mg/L and Faribault discharges phosphorus at 4.0 mg/L.

In July and September 2002, the MPCA published notice of intent to reissue NPDES permits for the Faribault and Owatonna wastewater treatment facilities, respectively. In response, relator submitted comments and a request for contested case hearings under Minn.Stat. §§ 14.57, 14.58, and Minn. R. 1400.5010 et seq., on the need for a phosphorus effluent limit of 1 mg/L based upon the MPCA's modeled effects to Lake Byllesby and the application of the phosphorus rule.

The MPCA conducted water quality modeling analyses to determine whether Faribault and Owatonna, separately, have a measurable impact on the adverse conditions present in Lake Byllesby. The MPCA's modeling showed that reducing the Owatonna facility's phosphorus effluent discharge to 1 mg/L would result in reductions of in-lake phosphorus of 9%, and reducing the Faribault facility's phosphorus effluent discharge to 1 mg/L would result in reductions of in-lake phosphorus of 15.86%.

But according to the MPCA, the modeling results indicated that reducing the cities' phosphorus effluent discharge to 1 mg/L would not have a measurable impact on the chlorophyll-a concentration or water transparency in Lake Byllesby, despite the fact that the modeling predicted that a 1 mg/L effluent limit for Owatonna would reduce chlorophyll-a by 4% and a 1 mg/L effluent limit for Faribault would reduce chlorophyll-a by 7%. The MPCA modeling analysis indicated that these predicted changes in chlorophyll-a and water transparency fell within the model's statistical margin of error. But relator's experts testified that (1) the model had a high margin of error and the actual reductions

in chlorophyll-a might in fact be higher; and (2) the MPCA model was inadequate because it was better calibrated to predict changes in the amount of phosphorus than changes in chlorophyll-a and water transparency. Finally, the MPCA analysis concluded that "[i]mprovements in lake water quality will likely only result from a combination of point and nonpoint source activities that dramatically reduce inflow phosphorus concentrations."

Relator's experts prepared a report and testified at the MPCA board meeting. Relator did not conduct any new modeling on the issue; instead, the report relied on the modeling done by the MPCA. Relator presented expert testimony that a 1 mg/L effluent limit for Faribault and Owatonna would have a measurable impact on Lake Byllesby because it would likely alter the in-lake dynamics, and it would alter the response that the lake will have to future decreases in the phosphorus load. Relator's experts also stated that the modeling technique used by the MPCA had a high margin of error, and that the modeling results did not support the MPCA's conclusions.

The MPCA board, following the recommendation of its staff who reviewed the documents produced by relator, concluded that none of the articles, memos, or other documents on which relator relied indicated any evidence of individual measurable effects by the cities' wastewater treatment facilities on Lake Byllesby. The MPCA further concluded that relator did not show a reasonable basis for its position that the facilities' discharges affect Lake Byllesby such that contested case hearings would aid the MPCA in resolving the matter.

Despite its stated concern regarding phosphorus levels in Lake Byllesby, and its modeling that indicated a 1 mg/L phosphorus limit for both facilities would result in an almost 25% reduction of phosphorus in the lake, the MPCA concluded that the individual discharge of phosphorus from each facility does not affect Lake Byllesby. Thus, the MPCA did not require either facility to limit phosphorus discharge pursuant to the phosphorus rule.

But, in issuing the NPDES permits, the MPCA included a requirement that a phosphorus management plan (PMP), be included in both NPDES permits. A PMP requires a wastewater facility to undertake a study to determine if its phosphorus discharge can be reduced through pollution prevention or improved wastewater treatment methods. Additionally, the MPCA has stated to this court that it is in the process of developing a total maximum daily load for Lake Byllesby, which will measure all sources of phosphorus and assign appropriate waste-load allocations to the various sources.

Relator contends that because its experts established that the discharges from the Faribault and Owatonna treatment plants have an adverse effect on Lake Byllesby, the phosphorus rule must be applied to the NPDES permits and the facilities must conform to the phosphorus effluent limit of that rule. In the alternative, relator argues that the evidence demonstrates disputed issues of material fact, such that contested case hearings on issuance of the NPDES permits are warranted.

## ISSUES

1. Did the MPCA err in its application of Minn. R. 7050.0211, subp. 1a, to the NPDES permits for the Faribault and Owatonna wastewater treatment plants?

2. Did the MPCA err in denying contested case hearings on the Faribault and Owatonna NPDES permits?

## ANALYSIS

Our standard of review of an agency decision denying a contested case hearing and granting a permit is governed by Minn.Stat. § 14.69(a)-(f) (2002). Under that statute, this court determines whether the agency's decision is in violation of constitutional provisions, in excess of the agency's statutory authority or jurisdiction, made upon unlawful procedure, affected by other error of law, unsupported by substantial evidence, or arbitrary or capricious. *Id.* Appellate courts defer to an agency's expertise in fact-finding and will affirm the agency's decision so long as it is lawful and reasonable. *In re Intra–LATA Equal Access and Presubscription,* 532 N.W.2d 583, 588 (Minn.App.1995), *review denied* (Minn. Aug. 30, 1995). "If an administrative agency engages in reasoned decisionmaking, this court will affirm, even though it may have reached a different conclusion had it been the factfinder." *Cable Communications Bd. v. Nor–West Cable Communications P'ship,* 356 N.W.2d 658, 669 (Minn.1984). But "[w]here there is a combination of danger signals which suggest the agency has not taken a hard look at the salient problems and has not genuinely engaged in reasoned decision making it is the duty of the court to intervene." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977) (quotation omitted).

## I.

Relator contends that the MPCA's decision to issue the permits without imposing a 1 mg/L restriction on phosphorus, as required by the phosphorus rule, is arbitrary and capricious and not supported by substantial evidence. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Hibbing Taconite Co.,* 431 N.W.2d 885, 891 (Minn.App.1988). Further, an agency's decision is considered arbitrary and capricious if it represents the agency's will, rather than its judgment. *Trout Unlimited, Inc. v. Minnesota Dep't of Agric.,* 528 N.W.2d 903, 907 (Minn.App.1995) (quotation and citation omitted), *review denied* (Minn. Apr. 27, 1995).

The phosphorus rule states that "[w]here the discharge of effluent is directly to or affects a lake or reservoir, phosphorus removal to one milligram per liter shall be required." Minn. R. 7050.0211, subp. 1a (2001). The MPCA acknowledged in its brief to this court that it "is concerned about cumulative phosphorus effects on Lake Byllesby" and that in the future "the Faribault and Owatonna facilities could be required to limit their discharge." The MPCA contends that in determining whether a discharge "affects" a lake under the rule, reference must be made to the MPCA's "phosphorus strategy," which was developed in 2000. But the strategy, by its own terms, is "not intended to be a rule and does not create any rights, substantive or procedural." And of course the strategy cannot contravene the plain meaning of the phosphorus rule, which was enacted in 1974 and has the force and effect of law. Nor can enforcement of the rule be ignored or delayed by the adoption of a strategy or by requiring development of a management plan.

The MPCA conducted what is referred to as BATHTUB modeling to determine whether Owatonna's wastewater treatment facility was affecting Lake Byllesby. Both parties agree that, within a margin of error, the modeling demonstrated that a reduction in phosphorus discharge to 1 mg/L would result in a reduction of phosphorus in Lake Byllesby of 13 μg/L, which represents a reduction of in-lake phosphorus of 9%. And the parties agree that the BATHTUB modeling for Faribault's wastewater treatment facility demonstrates that a re-

duction in phosphorus to 1 mg/L would result in a reduction in phosphorus in Lake Byllesby of 23 μg/L, which represents a reduction of in-lake phosphorus of 15.86%.

But the MPCA concluded that the loading of phosphorus levels reflected by the modeling was insufficient to show that Lake Byllesby is "affected." Citing its phosphorus strategy, it contends that the phosphorus rule does not apply unless a discharge from an individual wastewater treatment facility causes a significant change in chlorophyll-a or water clarity. And the MPCA further claims that because its modeling indicates that changes in chlorophyll-a and water clarity caused by the individual discharge from each facility was within the model's margin of error, the MPCA was required to conclude that the phosphorus discharges from the wastewater treatment facilities did not affect Lake Byllesby. But relator offered expert testimony challenging the modeling methodology used by the MPCA. Specifically, relator's experts stated that the MPCA's model did not accurately predict changes in chloraphyll-a or water clarity because the model was calibrated to most accurately predict changes in phosphorus, not chlorophyll-a or water clarity.

■ We agree with relator that the record before us raises questions concerning whether the MPCA engaged in reasoned decision-making. First, in addition to the fact questions raised by relator concerning methodology, the record raises concerns regarding the modeling process conducted by the MPCA. The first modeling analysis, which occurred sometime before June 30, 2002, determined the effects of applying the phosphorus rule to the Owatonna wastewater facility; the modeling also measured the effects the phosphorus rule would have if applied to both the Owatonna and Faribault facilities. Notwithstand-

ing the fact that the MPCA performed modeling that combined the effects of the phosphorus discharge from both facilities, the MPCA's response to relator's arguments concerning the combined effects of the two facilities is that combined effects are of no consequence when determining whether to apply the phosphorus rule.

Second, the MPCA's subsequent modeling analysis, which did not occur until January 2003, examined the effects of applying the phosphorus rule on Faribault's wastewater facility. And the results of the two models were summarized in separate office memoranda, the first, dated June 30, 2002, and the second, dated January 27, 2003. The stated purpose of both memoranda was "to provide you with an assessment of the need for a phosphorus effluent limit and the basis for such recommendation for the reissuance of NPDES [permits]." for the respective facilities. But the record indicates that the MPCA had already published a notice of intent to reissue Faribault's NPDES permit without a phosphorus limitation in July 2002, several months before any modeling was done on the effects of Faribault's facility.

Third, the conclusory manner with which the MPCA rejected relator's concerns is troublesome given the fact that the MPCA has, on previous occasions, acknowledged that Lake Byllesby is suffering from an excessive amount of phosphorus and that Faribault is a major contributor of that phosphorus. Moreover, the record suggests that MPCA board members may have relied on factors outside the phosphorus rule in determining the applicability of the rule. Specifically, the record indicates that at least one board member voted in favor of issuing the permits without phosphorus limits because of inclusion in the permit of a requirement that a phosphorus management plan be developed. And the

record also indicates concern by MPCA board members that "this is not a good economic time to put on a phosphorus limit." This concern with economics was further evidenced by a board member's comment that "I'm going to vote in favor of the staff resolution today, ... because of the high dollar hurdle that I heard for the two locations." But the phosphorus rule does not take into account economic considerations or the imposition of alternative regulatory schemes. Because the MPCA board has acknowledged a problem, acknowledged a source of the problem, and may have improperly considered factors outside of the phosphorus rule, we conclude that there are danger signals indicating the board's decision may not be reasoned and may reflect its will, rather than its judgment.

In addition, although not determinative, we note that the MPCA's phosphorus strategy specifically establishes that a phosphorus discharge of less than 1,800 lbs. per year by a publicly owned treatment works is "de minimus," because discharge at that level does not have "a measurable impact on the environment." In contrast to this "de minimus" level, the MPCA staff have estimated that the phosphorus discharges from the Faribault and Owatonna treatment plants are 46,767 lbs. per year and 33,941 lbs. per year respectively. If the phosphorus rule were applied to these facilities, each facility would be required to reduce its total yearly phosphorus discharge by an amount far greater than the "de minimus" amount.

Relator offered the opinions of three experts, and a report prepared by an environmental consulting firm that challenged the MPCA's interpretation of its models and concluded, based on the MPCA's models, that the Faribault and Owatonna wastewater treatment facilities were "affecting" Lake Byllesby. One expert stated that the "MPCA's conclusion that phosphorus from Owatonna and/or Faribault is not affecting Lake Byllesby is unsupported by its own modeling, its own correspondence and memorandum over the years, and its own Lake Assessment Program report." When experts disagree, a fact question arises. *Notch v. Victory Granite Co.*, 306 Minn. 495, 506, 238 N.W.2d 426, 433 (1976). On this record we cannot conclude that the MPCA's decision not to apply the phosphorus rule is supported by substantial evidence.

In conclusion, because we are uncertain as to whether the record establishes that the MPCA's decision was supported by substantial evidence, and because, as discussed below, we are remanding for contested case hearings, we do not reach the merits of relator's arguments that (1) because the discharges from the two facilities affect Lake Byllesby, application of the phosphorus rule is mandatory; and (2) the phosphorus rule requires the two facilities to remove phosphorus "to the fullest practicable extent."

**II.**

■ Relator argues that if this court concludes that the evidence is not fully adequate to support ordering phosphorus limits in the permits, at a minimum we should hold that the evidence demonstrates a dispute of material fact such that contested case hearings are warranted. While the above discussion indicates our concern regarding the decision-making process employed by the MPCA, we are not prepared to accept relator's invitation to re-write the permits to include a 1 mg/L phosphorus limitation. Rather, we have concluded that it would benefit the MPCA's decision-making process to fully analyze the fact issues raised by relator in contested case hearings on these permits.

Under its rules, the MPCA must grant a party's petition to hold a contested case hearing if it finds that

A. there is a material issue of fact in dispute concerning the matter pending before the agency;

B. the agency has the jurisdiction to make a determination on the disputed material issue of fact; and

C. there is a reasonable basis underlying the disputed material issue of fact or facts such that the holding of a contested case hearing would allow the introduction of information that would aid the agency in resolving the disputed facts in making a final decision on the matter.

Minn. R. 7000.1900, subp. 1 (2001). The MPCA contends there is no basis for ordering contested case hearings because relator failed to satisfy the third criterion. We disagree.

■ The burden is on relator, as the party requesting a contested case hearing, to demonstrate the existence of material facts that would aid the agency in making a decision. *In re Solid Waste Permit for the NSP Red Wing Ash Disposal Facility,* 421 N.W.2d 398, 404 (Minn.App.1988), *review denied* (Minn. May 18, 1988). And there must be some showing that evidence can be produced that is contrary to the action proposed by the agency. *In re Amendment No. 4 to Air Emission Facility Permit No. 2021–85–OT–1,* 454 N.W.2d 427, 430 (Minn.1990).

The MPCA relies on *In re Solid Waste Permit for the NSP Red Wing Ash Disposal Facility,* for the proposition that relator is not entitled to a contested case hearing because they have not produced any "new" evidence. 421 N.W.2d at 404. But that case is distinguishable because the *Red Wing* court found that (1) the MPCA had not yet done the testing necessary to determine whether there would be adverse environmental affects; and (2) since there had been no testing, the issues raised by the relator were not supported with any facts such that a contested case hearing would have aided the MPCA in making a final decision on the permit. *Id.* at 403–05. In addition, the *Red Wing* court recognized that expert testimony "would aid in the resolution" of the problem, but noted that relator failed to provide any specific expert's name or any indication of what specific new facts an expert might testify to at a contested case hearing. *Id.* at 404. Therefore, the court held that relator was not entitled to a contested case hearing. *Id.* at 404–05.

Here, although challenged by relator, the MPCA has conducted modeling which it deems adequate to determine whether the wastewater treatment facilities are adversely affecting Lake Byllesby. And, unlike the facts in *Red Wing,* relator has identified the names and provided affidavits of experts who have (1) challenged both the MPCA's methodology and interpretation of its modeling for phosphorus effects; and (2) determined that the wastewater treatment facilities at issue are affecting Lake Byllesby. In addition, relator has introduced a report by an environmental consulting firm that concluded, based on MPCA modeling, that (1) the wastewater treatment facilities were individually having a negative effect on Lake Byllesby; and (2) a 1 mg/L total phosphorus effluent limit on the Faribault and Owatonna facilities would substantially improve the water quality of the lake.

We conclude that this information constitutes evidence regarding disputed material facts and would aid the MPCA in a reasoned decision-making process. And we reject the MPCA's contention that because the MPCA board chose to disregard relator's evidence in the previous proceedings, a contested case is precluded because

relator's evidence is not "new." Where relator has raised a genuine question concerning whether the MPCA adequately addressed the disputed fact issues, we conclude that a presentation of these issues to a neutral administrative law judge in a contested case hearing will "aid the agency in resolving the disputed facts and making a final decision on the matter." Minn. R. 7000.1900, subp. 1 (2001).

## DECISION

There is a question of fact as to whether, in light of the plain language of the phosphorus rule, the MPCA's decision not to apply the phosphorus rule to the NPDES permits for the Faribault and Owatonna wastewater treatment facilities is supported by substantial evidence. And relator has raised issues of fact regarding the methodology and interpretation of phosphorus modeling studies conducted by the MPCA. We therefore reverse the MPCA's issuance of NPDES permits and remand this matter for contested case hearings.

**Reversed and remanded.**