*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1899**

In the Matter of the Appeal by Hawa Abdulle, Ayan Home Health Care, LLC, and Hawa Abdulle Adult Foster Care of the Order of License Revocation.

**Filed December 29, 2025
Affirmed
Harris, Judge**

Minnesota Department of Human Services
File No. 39249

Jason Steck, Brooklyn Center, Minnesota (for relators Hawa Abdulle and Ayan Home Health Care)

Keith Ellison, Attorney General, R.J. Detrick, Assistant Attorney General, St. Paul, Minnesota (for respondent Minnesota Department of Human Services)

Considered and decided by Smith, Tracy M., Presiding Judge; Slieter, Judge; and Harris, Judge.

**NONPRECEDENTIAL OPINION**

**HARRIS**, Judge

In this certiorari appeal, relators challenge the revocation of their adult-foster-care licenses. Relators argue that (1) respondent Minnesota Department of Human Services (the department) erroneously relied on its own definition of "primary residence" without

promulgating the definition as a rule[1] and (2) the department's decision was arbitrary and capricious.[2]  We affirm.

## FACTS

Relators Hawa Abdulle and Ayan Home Health Care LLC were licensed to provide adult-foster-care services (AFC) and home and community-based services (HCBS) at an address on Ashland Drive in Rochester.  Abdulle is the AFC license-holder.  Ayan Home Health Care is the HCBS license-holder.  Abdulle is the authorized agent and sole controlling individual of Ayan Home Health Care.[3]

In December 2021, Abdulle requested to change the AFC license address from the home on Ashland Drive to a home on Arctic Fox Road in Rochester.  The department granted the request, and Arctic Fox Road became the residence where Abdulle was licensed to provide AFC and HCBS services.  Under Minnesota law, the AFC license-holder must live in the licensed residence as their "primary residence."  Minn. Stat. § 245A.02, subd. 6f (2024); *see also* Minn. Stat. § 245A.03, subd. 7 (2024) (licensing moratorium).  If the AFC

---

[1] Abdulle initially argued in her brief that the department erred as a matter of law because it based its decision to revoke her license on a definition of "primary residence" that arose from unpromulgated rulemaking.  Abdulle conceded during oral argument that the department did not create or enforce its own definition of "primary residence" as an unpromulgated rule.  Therefore, we need not address this issue in our opinion.

[2] Abdulle also argues that the department's license revocations in Olmsted County are racially motivated.  Abdulle concedes that she failed to raise this argument before the administrative-law judge (ALJ), therefore forfeiting the issue.  *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that appellate courts generally address only those questions previously presented to and considered by the district court).

[3] Relators will generally be referred to as "Abdulle" throughout this opinion.

2

license-holder does not maintain the licensed residence as their "primary residence," the department is required to revoke the AFC license. Minn. Stat. § 245A.03, subd. 7. As the AFC license-holder, Abdulle was required to live at Arctic Fox Road as her primary residence.

In February 2021, the department issued a guidance document to all county licensors. This guidance document set forth a non-exclusive list of 12 factors (guidance factors) that licensors could consider in determining a license-holder's primary residence.

In January 2023, the department conducted a license review of Arctic Fox Road. Present at the review was Abdulle; her son, M.A., who served as Ayan's designated coordinator and manager[4]; and a staff member from Ayan. The department primarily spoke with M.A. throughout the review.[5] During the review, M.A. told the department that "they"

---

[4] Designated coordinator and manager are statutorily defined positions. *See* Minn. Stat. § 245D.081 (2024). Under Minnesota Statutes section 245D.081, subdivision 2, a designated coordinator must supervise, support, and evaluate individual service delivery, including oversight of support-plan responsibilities; facilitating progress toward outcomes; providing or delegating staff instruction and competency assessment; and evaluating the effectiveness of services and methodologies. The coordinator must be competent through education, training, and relevant work experience and must meet the minimum statutory qualification pathways outlined in subdivision 2(b). *Id*., subd. 2. Under Minnesota Statutes section 245D.081, subdivision 3, a designated manager must ensure program-wide compliance with licensing requirements; fulfillment of coordinator duties; implementation of corrective action and required internal reviews; evaluation of satisfaction and protection of persons' rights; assurance of staff competency, orientation, and training; compliance with commissioner-ordered corrective actions and license conditions; and development and implementation of ongoing program improvements. The designated manager must meet required competency, educational, training, and supervisory-experience criteria. *Id*., subd. 3.

[5] The department primarily spoke with M.A. during the review as he seemed fluent in English. Abdulle's native language is Somali, and she is not fluent in English.

had another home across the street. The home M.A. was referring to was Ashland Drive, the previous address listed on Abdulle's AFC license. M.A. spontaneously indicated that all his family members, including Abdulle, lived at the "family home." [6] Abdulle then interjected, speaking to M.A. in Somali. M.A. then changed his prior statement, explaining that Abdulle was at Arctic Fox Road "around the clock." The department did not ask Abdulle if Arctic Fox Road was her primary residence. During the review, the department observed and photographed the room that M.A. identified as belonging to Abdulle. The room contained clothing, a television, a videogame system, a bed, an additional mattress, and other personal effects. The department documented that the bedroom arrangement appeared "strange" and "odd," noting that individuals were apparently sharing a room despite the presence of unoccupied bedrooms in the basement at the time of the review.

In April 2023, the department issued an order revoking Abdulle's AFC and HCBS licenses. In May 2023, the department amended the revocation order to correct certain statements made in the original order and to rescind a violation that was erroneously cited. Relying on its guidance factors, the department concluded that Arctic Fox Road was not Abdulle's primary residence. The department based its decision on M.A.'s statements during the license review, overall observations of Arctic Fox Road, and Abdulle's driver's license, homestead declaration, and background-study submissions.

Abdulle filed an administrative appeal, and the matter was heard by an ALJ during a contested-case hearing in January 2024. The ALJ concluded that the revocation of

---

[6] M.A. further explained that he called Ashland Drive the "family home" because it was the first home his family purchased.

Abdulle's AFC license was improper, finding that Abdulle proved by a preponderance of the evidence that Arctic Fox Road was her primary residence. Accordingly, the ALJ recommended that the department rescind the license revocation order and instead placed Abdulle on a conditional license.

The commissioner of human services rejected the ALJ's recommendation and affirmed the revocation of Abdulle's licenses. The commissioner determined that the evidence demonstrated that Arctic Fox Road was not Abdulle's primary residence and rejected the ALJ's characterization of Abdulle's driver's license, background study, and homestead documentation. The commissioner also found that M.A.'s initial, spontaneous statement that Abdulle did not live at Arctic Fox Road was more credible than his later testimony and concluded that both Abdulle's and M.A.'s claims that Abdulle lived at Arctic Fox Road were not credible. Additionally, the commissioner determined that other witnesses' observations of Abdulle at Arctic Fox Road did not outweigh other evidence that it was not her primary residence, given the timing and circumstances of those visits. The commissioner further concluded that revocation of the AFC license required revocation of the HCBS license under Minnesota Statutes section 245A.04, subdivision 7(d) (2022).[7] Based on the 19 violations identified during the license review,

---

[7] Minnesota Statutes section 245A.04, subdivision 7(d) was amended effective July 2023 to allow the commissioner not to revoke a license based on a prior revocation only when, in addition to another requirement, the license is in substantial compliance with applicable laws and rules. 2023 Minn. Laws ch. 61, art. 7, § 1, at 2420-21. Because the changes to the statute became effective in 2023, after the issuance of the commissioner's order, we review the commissioner's decision under the former statute.

the commissioner independently determined that revocation of both the AFC and HCBS licenses was appropriate.

Abdulle appeals.

## DECISION

**I.    The department's decision to revoke Abdulle's licenses was not arbitrary and capricious.**

An agency's decision is considered "arbitrary and capricious" if the agency relies on factors not intended by the legislature, fails to consider important aspects of the problem, offers an explanation that is contrary to the evidence, or makes a decision that "is so implausible that it could not be explained as a difference in view or the result of an agency's expertise." *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006). An agency's conclusions are not arbitrary and capricious so long as there is a "rational connection between the facts found and the choice made." *In re Rev. of 2005 Ann. Automatic Adjustment of Charges for All Elec. & Gas Utils.*, 768 N.W.2d 112, 120 (Minn. 2009) (quotation omitted). "Unless the Commissioner's decision is arbitrary and capricious and without substantial support in the record, we shall affirm. When reviewing questions of law, however, we are not bound by the agency's decision, and we need not defer to the agency's expertise." *Dozier v. Comm'r of Human Servs.*, 547 N.W.2d 393, 395 (Minn. App. 1996) (citation omitted), *rev. denied* (Minn. July 10, 1996).

Abdulle argues that the revocation of her AFC and HCBS licenses was arbitrary and capricious because (A) the department applied its guidance factors inconsistently, (B) the

department relied on factors not intended by the legislature, (C) the department's decision was not supported by substantial evidence, (D) the department disregarded Abdulle's plausible, innocent explanations for the address listed on her driver's license, homestead declaration, and background-study submissions, and (E) the department rejected the ALJ's credibility determinations without adequate explanation. We address each argument in turn.

### A. The department did not apply its guidance factors inconsistently.

First, Abdulle argues that the agency acted arbitrarily and capriciously because the agency "abandoned its relatively consistent focus in recent cases where the AFC license-holder spent her time in favor of a new and ad hoc focus on statements purportedly made in official documents."

Abdulle relies on several ALJ decisions from unrelated matters to support this proposition that the department has shifted its analysis from determining where a license-holder actually resides to relying solely on official documentation. *See In re the Appeal by Yeboah*, OAH 22-1800-38540, 2023 WL 4892358, at *2 (Minn. Off. Admin. Hrgs. July 27, 2023); *In re the Appeal by Geyer*, OAH 60-1800-38715, 2023 WL 4080284, at *5 (Minn. Off. Admin. Hrgs. June 13, 2023); *In re the Appeal by Iddris*, OAH 71-1800-39461, 2024 WL 576332, at *7 (Minn. Off. Admin. Hrgs. Feb. 5, 2024).[8] The facts in these matters do not support Abdulle's position. In *Yeboah*, the ALJ considered where the licensee actually

---

[8] *Yeboah*, *Geyer*, *and Iddris* are nonprecedential, administrative decisions that are not binding authority on our court.

7

slept but also relied on additional evidence—including court filings by the licensee listing a different residential address. 2023 WL 4892358, at *13-14. In *Geyer*, the licensee expressly acknowledged that she did not reside in the AFC home, a fact that materially distinguishes that case from the one at hand. 2023 WL 4080284, at *6. In *Iddris*, the ALJ relied on evidence that the licensee had attested, under penalty of perjury in a court filing, that he lived at a different residence and identified the AFC home as his workplace. 2024 WL 576332, at *7. In each of these cases, contrary to Abdulle's assertion, the department did not rely solely on where the licensee physically resided. Rather, it considered that information alongside other evidence, including representations made in government filings. As in those matters, the department here properly considered information beyond Abdulle's statements on official documents in determining that Arctic Fox Road was not Abdulle's primary residence.

Similarly, in *In re Yusuf*, No. A24-0430, 2024 WL 4814785, at *1 (Minn. App. Nov. 18, 2024), we upheld the department's revocation of Yusuf's AFC license after it concluded that the AFC residence was not Yusuf's primary residence.[9] The department observed that the home "had a sterile environment with nothing on the walls other than instructional and facility signs," that the bathroom contained no personal toiletries, that Yusuf's bedroom held only "roughly five articles of clothing and a small suitcase," and that the bed and desk in the room "were covered with boxes, office items, and cleaning

---

[9] This opinion is nonprecedential and, therefore, not binding. We cite *Yusuf* as persuasive authority only. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c) ("Nonprecedential opinions . . . are not binding authority . . . but nonprecedential opinions may be cited as persuasive authority.").

supplies that appeared to have been unmoved for a while." *Yusuf*, 2024 WL 4814785, at *2. Additionally, a resident of the AFC home informed the department that "Yusuf did not stay in the foster-care home most overnights." *Id.* Yusuf argued that the department inconsistently applied its guidance document when revoking the license. *Id.* at *4. We rejected that argument because Yusuf did not support his argument with any evidence or authority. *Id.*

Abdulle argues that our decision in *In re Casterton*, No. A21-1393, 2022 WL 2912152 (Minn. App. July 25, 2022), reflects the department's current enforcement practice. In *Casterton*, the department revoked the license after determining that the AFC residence in Finlayson was not the licensee's primary residence. 2022 WL 2912152, at *4. Casterton was not home when the department arrived to conduct an unannounced licensing visit . *Id.* at *1. The department further observed that Casterton did not have a bedroom at the home, kept no personal items there—such as a toothbrush or deodorant—and frequently carried an overnight bag when staying at the residence. *Id.* We concluded that the commissioner's determination was not arbitrary or capricious. *Id.* at *4. We noted that "[o]n this record, a reasonable mind could conclude that the Finlayson home was not Casterton's primary residence, and there is a rational connection between the facts found and conclusions drawn from them." *Id.*

Like in *Yusuf* and *Casterton*, the department did not inconsistently apply its guidance factors in revoking Abdulle's license. Nor did the department solely rely on the addresses listed on Abdulle's government documents to determine her primary residence. In fact, the department weighed other factors, including Abdulle's bedroom, her clothing

9

and personal items, and where her children lived and spent time. We are also unpersuaded by Abdulle's argument that in prior cases, the department only focused on where a license-holder spent their time.

Contrary to Abdulle's argument that the department had developed an investigative framework focused on where a license-holder actually resides, in both *Yusuf*, 2024 WL 4814785, at *2 and *Casterton*, 2022 WL 2912152, at *4, the department considered additional factors, including the condition of the license-holder's bedroom and the presence or absence of personal items.

Accordingly, we conclude that the department did not apply its guidance factors inconsistently.

### B. The department did not rely on factors that were unintended by the legislature.[10]

Next, Abdulle argues that the legislature did not intend for a license-holder's primary residence to be determined by the department's guidance factors, mainly the license-holder's driver's license or homestead declaration. Abdulle asserts that the

---

[10] Initially, Abdulle argued that the commissioner's decision to revoke her license was based on an unlawful procedure, arising from reliance on an unpromulgated rule defining "primary residence." However, at oral argument, Abdulle conceded that, while non-precedential, the reasoning in *In re Petition of Minn. Ass'n of Residential Servs. Homes*, No. A24-1562, 2025 WL 1922283, at *6 (Minn. App. July 15, 2025) (*MARSH*) (holding that the department's guidance document was not being enforced as a duly adopted rule) was persuasive, and she withdrew this argument. We rely on *MARSH* as persuasive authority only. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c). We agree that the reasoning in *MARSH* is persuasive as it interprets the same department guidance document at issue here. We also agree that the department's use of its guidance document does not constitute enforcement of an unpromulgated rule.

10

department selected a definition of "primary residence" that suited their needs. We disagree.

Minnesota law requires adult-foster-care license-holders to maintain the licensed facility as their "primary residence." Minn. Stat. § 245A.02, subd. 6f. The statute does not define "primary residence," nor does any other provision in chapter 245A supply a definition applicable to adult-foster-care settings. In the absence of a statutory definition, the department issued a guidance document to clarify the meaning of this requirement. *See MARSH*, 2025 WL 1922283, at *3-6 (holding that the department did not enforce an unpromulgated rule when articulating the "primary residence" and "primary caregiver" requirements for adult-foster-care programs). The department is required to provide counties with technical assistance to ensure that applicable rules and statutes are enforced uniformly throughout the state. Minn. Stat. § 245A.16, subds. 5, 6 (2024). "Interpretive guidelines do not have the force and effect of law and have no precedential effect but may be relied on by . . . the Department of Human Services . . . ." Minn. Stat. § 245A.09, subd. 9 (2024).

Here, the department developed a non-exclusive list of factors "to try to help licensors understand what things to consider when determining whether a person is residing in a[n] [adult-foster-care] home as their primary residence." Licensors consider factors such as whether a person owns more than one residence, where they spend the majority of their time, whether they have a spouse or children, and if so, where they primarily reside, the address listed on a person's driver's license, property records, and tax records. Therefore, because the department has authority to develop and rely on its guidance factors

11

as interpretive guidelines, the department did not rely on factors not intended by the legislature. Next, we turn our analysis to whether the department's decision was supported by the record.

### C. The department's decision is supported by substantial evidence.

The department's decision to revoke Abdulle's licenses was sufficiently supported by evidence in the record. Abdulle's driver's license and background-study submissions identify Ashland Drive as her address. Abdulle's homestead declaration also lists Ashland Drive as her residence. Additionally, testimony from the administrative hearing indicates that M.A. referred to Ashland Drive as the "family home" in which Abdulle lives. Abdulle's repeated representations during the license review indicated that her primary residence was Ashland Drive rather than Arctic Fox Road. M.A. also made statements that demonstrated that Ashland Drive was Abdulle's primary residence. The department relied on photographic evidence and observations showing individuals apparently sharing a bedroom at Arctic Fox Road despite the availability of unoccupied rooms at the time of the review. In addition, the department cited inconsistencies between the testimony of Abdulle and M.A. concerning the purported sleeping arrangements at Arctic Fox Road. We recognize that there were factors that would support an ALJ's conclusion that Arctic Fox Road was Abdulle's primary residence, such as a bedroom containing Abdulle's clothing and sentimental personal effects. Abdulle's presence at Arctic Fox Road is also corroborated. Family members of the adult-foster-care residents personally observed Abdulle in the residence at all times, and department licensors who conducted unannounced visits found Abdulle to be present.

Abdulle contends that the department "cherry-picked" its definition of "primary residence" from unrelated statutory provisions. This argument is unpersuasive. Under any reasonable definition of "primary residence," the record supports the order revoking the AFC license. Abdulle concedes that, regardless of the definition applied, an individual must actually live in the home claimed as their primary residence. The evidence supports the commissioner's determination that she did not reside at Arctic Fox Road. Her driver's license, background study, and tax records all listed a different address, and M.A. informed DHS licensors that Abdulle lived with him at the Ashland Drive address identified on those documents. Accordingly, irrespective of how this court interprets the statutory term "primary residence," substantial evidence supports the revocation decision.

We also recognize that the department could have taken additional steps to investigate Abdulle's residency. For instance, when conducting Abdulle's license review, the department could have provided Abdulle an interpreter and not used M.A.to communicate with her in a different language. The department could also have asked Abdulle directly whether Arctic Fox Road was her primary residence but did not do so. And the department could have asked the residents or their legal representatives about Abdulle's presence at Arctic Fox Road. But fact-finding is not our responsibility. Rather, our task is to determine whether the record adequately supports the department's decision. We conclude that it does.

Because the department's determination that Arctic Fox Road was not Abdulle's primary residence is supported by evidence in the record, we conclude that the

department's reliance on its guidance factors as interpretive guidelines was not arbitrary or capricious.

**D.  The department did not disregard Abdulle's plausible, innocent explanations for the address listed on her drivers' license, homestead declaration, and background-study submissions.**

Abdulle argues that the department improperly relied on Abdulle's driver's license, homestead declaration, and background-study submissions, and "completely disregarded" Abdulle's plausible explanations for the use of the Ashland Drive address on those government documents.  We disagree.

"With respect to factual findings made by the agency in its judicial capacity, if the record contains substantial evidence supporting a factual finding, the agency's decision must be affirmed." *In re Excelsior Energy, Inc.*, 782 N.W.2d 282, 290 (Minn. App. 2010) (quotation omitted).  "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and it requires more than a scintilla, some, or any evidence." *In re NorthMet Project Permit to Mine Application*, 959 N.W.2d 731, 749 (Minn. 2021) (quotations omitted).  In evaluating whether an agency's decision satisfies this standard, we consider whether the agency has "adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *Id.* (quotation omitted).  "Appellate courts defer to an agency's expertise in fact-finding and will affirm the agency's decision so long as it is lawful and reasonable." *In re City of Owatonna's NPDES/SDS Proposed Permit Reissuance*, 672 N.W.2d 921, 926 (Minn. App. 2004).

14

The department found that when Abdulle renewed her driver's license in 2022, she listed Ashland Drive as her address, despite changing the AFC license address to Arctic Fox Road a year prior. The department concluded that Abdulle's driver's license renewal was direct evidence that Ashland Drive was Abdulle's primary residence. With respect to Abdulle's homestead declaration, the department found that Abdulle's homestead was registered to Ashland Drive. Homestead is defined as "the dwelling occupied as [a person's] principal residence." Minn. Stat. § 290A.03, subd. 6 (2024). The department found Abdulle's homestead was evidence that Ashland Drive was her primary residence. Lastly, Abdulle's background-study submission identified Ashland Drive as her residence. An individual who is the subject of a background study must provide the department with their current home address, city, and state of residence. Minn. Stat. § 245C.05, subd. 1(a)(2) (2024). By listing Ashland Drive on the background-study submissions, the department concluded that Ashland Drive was Abdulle's primary residence.

We conclude that the department adequately explained the basis for its determination and that substantial evidence supports its finding that Abdulle's primary residence was not Arctic Fox Road.

### E. The department did not reject the ALJ's credibility findings without adequate explanation.

Abdulle argues that the department's decision was arbitrary and capricious because it disregarded the ALJ's credibility findings without adequate explanation and it ignored the ALJ's positive credibility findings of M.A. We disagree.

The commissioner is "not required to treat the ALJ's recommendation with the same deference an appellate court must accord the findings of a trial court." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 274 (Minn. 2001). "Rejection of the ALJ's recommendations without explanation . . . may suggest that the agency exercised its will rather than its judgment and was therefore arbitrary and capricious. *Id.* at 278. But an agency's decision is not arbitrary and capricious if the commissioner articulates "a rational connection between the facts found and the choice made." *Id.* at 277 (quotation omitted).

"It is well-established that appellate courts generally defer to credibility determinations made by an agency's fact-finder . . . ." *In re Thompson*, 935 N.W.2d 147, 156 (Minn. App. 2019), *rev. denied* (Minn. Dec. 17, 2019). In doing so, "[w]e defer to an agency's conclusions regarding conflicts in testimony, the weight given to expert testimony and the inferences to be drawn from testimony." *In re Excess Surplus*, 624 N.W.2d at 278. But when an agency departs from the ALJ's credibility findings, the court reviews the agency's findings "more critically." *In re Occupational License of Hutchinson*, 440 N.W.2d 171, 176 (Minn. App. 1989), *rev. denied* (Minn. Aug. 9, 1989).

We conclude that the commissioner's decision adequately explained how she reached her credibility determinations. The commissioner modified the ALJ's findings regarding the testimony of three witnesses: M.A.; S.A., the mother and legal representative of a resident at Arctic Fox Road; and E.T., an Olmsted County investigator.

The commissioner found M.A. not credible because he changed his prior statement—originally reporting that Abdulle lived at the "family home" on Ashland

Drive—to testifying that Abdulle lived "around the clock" at Arctic Fox Road after speaking with Abdulle in Somali. The commissioner gave more weight to M.A.'s initial statement that Abdulle lived at Ashland Drive because it was "spontaneous." The commissioner also noted inconsistencies between M.A.'s testimony and Abdulle's testimony. M.A. testified that Abdulle lived at Arctic Fox Road with her three minor children and that the children shared one bedroom, leaving a basement bedroom unused. Abdulle testified that she shared a bedroom with her youngest child while another child occupied the basement bedroom. Because these accounts conflicted, the commissioner concluded that M.A.'s statements regarding Abdulle's primary residence were not credible.

The commissioner also discounted the testimony of S.A., who stated that Abdulle was always present at Arctic Fox Road when S.A. visited her son. The commissioner found this testimony unreliable because S.A. notified Abdulle of her visits in advance, making it "more likely than not that [relator] Abdulle ensured she was present . . . during those visits because she knew of the visits in advance."

Finally, the commissioner rejected the testimony from E.T., the Olmsted County investigator, as irrelevant. Although E.T. testified that Abdulle was present during both of her visits to Arctic Fox Road and appeared to live there, those visits occurred two years before the license review and again months after it. The commissioner concluded that E.T.'s testimony did not bear on whether Arctic Fox Road was Abdulle's primary residence during the January 2023 license review.

Because the commissioner adequately explained her modifications to and rejections of the ALJ's credibility findings, her decision was not arbitrary and capricious. Moreover,

because this court defers to the commissioner's credibility determinations, we affirm the commissioner's decision.

For the reasons discussed above, we conclude that the commissioner's decision was neither arbitrary nor capricious.

**Affirmed.**